UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Criminal Case No.1:08-CR-124 (HHK) |
| | : | |
| | : | |
| | : | |
| v. | : | Sentencing: July 30, 2008 |
| | : | |
| WEI CHIN, | : | |
| | : | |
| Defendant. | : | |

---

**DEFENDANT'S MOTION WITH REGARD TO**
**18 U.S.C. § 3553(a) SENTENCING FACTORS and**
**MEMORANDUM IN AID OF SENTENCING**

The defendant, Wei Chin, through undersigned counsel, respectfully submits to the Court his position regarding the sentencing factors espoused in 18 U.S.C. § 3553(a). The Supreme Court's decision in *United States v. Booker,* 125 S. Ct. 738 (2005) and its progeny require district courts to consider all the factors contained in § 3553(a) when calculating a criminal defendant's ultimate sentence. This motion presents Mr. Chin's position with regard to those factors contained in § 3553(a). In short, in light of Mr. Chin's lack of criminal history, his long history of work, his family involvement, his plea of guilt, his remorse, his history of depression, his cooperation with the government and the fact that he is now a convicted felon, subject to deportation immediately upon release from prison, we respectfully request the Court to sentence him to the lowest sentence sufficient to meet the goals of § 3553(a), a sentence we respectfully submit, should be in a range of 18 to 20 months incarceration. *See United States v. Ferguson,* 456 F.3rd 660, 665 (6th Cir. 2006).

## INTRODUCTION

Wei Chin stands before the Court for sentencing, having entered a plea of guilty to a one count Information charging Travel with Intent to Engage in Illicit Sexual Conduct, in violation of 18 USC Section 2432(b). He brings with him an immeasurable amount of regret, remorse, sorrow, humiliation and despair for his conduct in this case. To those who know Mr. Chin, it is inconceivable that he would stand accused of crimes of this nature. Indeed, when the Court considers his upbringing, impressive background and actions in this case, it is quite clear that Mr. Chin is far from the typical criminal defendant.

We respectfully submit that Mr. Chinn's conduct in this case is inconsistent and inapposite to the type of person that he truly is. Nevertheless, Mr. Chin's actions in this case were wrong and unjustifiable. In pleading guilty, Mr. Chin has taken full responsibility for his actions and offers his sincere apology to the Court, his family, friends, and the community.

## THE PRESENTENCE REPORT

Mr. Chin and counsel have reviewed the presentence report prepared by United States Probation Officer Michael Penders. We find the report to be fair and accurate, and offer no objections to the content of the report nor to the sentencing guideline calculations presented. Mr. Penders notes that the advisory guidelines provide for a sentencing range of 46 to 57 months (offense level 23, criminal history I), acknowledging that Mr. Chin's status as a deportable alien may warrant a downward departure of six months. *United States v. Smith*, 27 F.3d 649 (D.C. App. 1999).

## PERSONAL BACKGROUND OF WEI CHIN

### I.    MR. CHIN'S UPBRINGING

Wei Chin was born on August 13, 1970 in Beijing, China. He was the youngest of two children born to Baoqi Qin and Naifang Wang. While the family was not wealthy financially, (his dad was a history professor and his mom a middle school and high school Chinese teacher) they were rich emotionally. The family was emotionally close –knit and participated in family activities, always having dinner together to discuss the events of the day, where the parents had teaching moments with their children, those seemingly unremarkable times when a parent imparts something to their children that they will keep with them forever.

Mr. Chin's parents encouraged him to do well in school and be respectful of others. His parents provided him with a stable home, proper guidance, direction and core values. And, as the Court can see from Exhibit One, a letter to the Court from Mr. Chin's parents, this guidance has paid rich dividends. The person they know is a kind, honest man, full of sympathy and love. He is a person who has always gone out of his way to help others.

Mr. Chin's family was shocked to learn that he had been arrested in this case. This matter has had a particularly devastating effect on those closest to him.

### II.    MR. CHIN'S EDUCATIONAL BACKGROUND AND WORK HISTORY

Mr. Chin attended what his parents describe as among the best public elementary, junior high and high schools in Beijing. Not only were his grades good in school, he was always an

eager participant in school, volunteering to help his teachers and other students. He developed a passion for writing and numerous of his writings were published.

Mr. Chin started his college education at the People's University in 1990. He graduated in 1994, and began work in China for the China International travel Agency. In 1997 he was admitted to the School of Hotel Management at the University of Massachusetts. Mr. Chin graduated in 1999 with a master's degree in Hotel Management. He continued his studies in Management of Information Systems at the University of Maryland, earning another master's degree in 2000.

After graduating from the University of Maryland Mr. Chin began work in the Information Technology industry as a computer programmer. As Mr. Chin explains more fully in his letter to the Court, attached as Exhibit two, he blundered into the computer programming field. He has always been a sensitive person, more suited to fields where he could write and express his emotions or offer assistance to others, such as could have been the case had he continued in the hotel management filed, an area where he holds a master's degree, and an area that he may well pursue when released from prison and deported to his native Country.

It may well have been this unfortunate choice of first jobs that has led in great part to the depression and feeling of failure that has brought Wei Chin before the Court. After taking the first position in computer programming, Mr. Chin continued in the filed, even though he was probably not suited in any manner to be a computer programmer. As he explains, he held 7 different jobs, all of which he ultimately lost, for one reason or another, from June of 2000 until January, 2008. Even though each failure angered and humiliated him, and led to greater and greater depression, he did not give up. He continued to seek employment in order to support his family.

4

## III.    THE OFFENSE CONDUCT

The offense conduct is presented in the presentence report. And while we do not simply wish to repeat the information already provided to the Court, we do wish to elaborate on the mental state of Mr. Chin and the difficulties in his life which led him to commit this crime.

Shortly after first meeting Wei Chin it became apparent to counsel that he was an extremely depressed individual. He had extreme mood changes, sometimes tearful and sometimes presenting a dull affect. Counsel retained the services of Michael L. Hendricks, Ph.D., a Board Certified Clinical Psychologist, to evaluate Mr. Chin and determine the extent of any mental health issues. Dr. Hendricks' report is attached as Exhibit Three. That report, viewed with Mr. Chin's letter to the Court, the presentence report and the letter from Mr. Chin's wife, attached as Exhibit Four, provide a clear picture of a person suffering from severe depression, brought about by a combination of factors, including an inability to hold a job, living in constant scorn at the hands of his wife and mother-in-law, and loneliness.

Mr. Chin and his wife have had difficulty in their marriage for several years. Their difficulty was a result of a marriage not meant to be, the difficulty Wei had in maintaining employment, his loss of self esteem and, for two years, a lack of intimacy. As Dr. Hendricks' explains, "it may be helpful to note the relationship between [the criminal conduct] and his depressive disorders. Having had symptoms of depression for the last seven years without any treatment until recently eroded Mr. Chin's interest and ability to maintain a view of himself as competent, worthwhile and interpersonally connected to significant others in his life. As his depression has persisted and contributed to his inability to either find a way to function more effectively in his chosen career track or to jump tracks to pursue another line of work, he also

5

lost any sense of control over his future. Ultimately, this resulted in his having given up on planning for his future or even caring what might happen to him. This hopelessness manifested in reckless behavior that was apparent in his occupational functioning, in his interpersonal relationships (particularly in his marriage) and in his on line behavior. It is unlikely that Mr. Chin set out to engage in any sort of illicit sexual behavior (or any other illicit behavior). More probably, he simply lost his ability to feel that he could effect a positive outcome for himself and so stopped engaging in the sort of self-censoring activity that is typical of responsible adults. Indeed, his hopelessness had even risen to the level that he had been contemplating methods of suicide. When individuals are in such a state of despair, they are unlikely to be able to accurately discern those behaviors that will likely result in desirable outcomes from those that will likely result in undesirable outcomes. This is evident in the chat transcript, when Mr. Chin indicated his suspicion that he was interacting with a police officer. Even with this awareness, profound hopelessness would have made it difficult for Mr. Chin to exercise the judgment necessary to change the course of his behavior to avert a probable negative outcome—i.e., to curtail the interaction with the officer." Report at p. 7.

We also believe it important to note, in discussing the offense conduct, that even though Mr. Chin's profound hopelessness made it difficult to exercise the judgment necessary to change the course of his behavior, he was still reluctant to meet the person he believed to be underage. A careful review of the chat log shows that Mr. Chin had chats with the undercover, who he believed to me a minor, the year before the last series of chats and refused to meet for any illicit activities, insisting that they wait until "she" was 18. During the last chats, leading up to his arrest, Mr. Chin asked "her" how old she was, but was never given an answer.

6

We believe the chat logs to hold significance for two reasons. First, they demonstrate that even in his state of despair, Mr. Chin was reluctant to meet a minor. (He had met two adults in the chat rooms and had an affair with each.) Second, while there is no doubt that Mr. Chin knew that the person he was to meet on the day of his arrest was a minor, there is doubt as to her exact age, and at the risk of splitting hairs, we would submit that there is a difference, even if a small one, in engaging in sexual activity with a 14 year old than with a 15, 16 or 17 year old.

Regardless of the age Wei Chin believed this minor to be, his despair and sense of hopelessness prevented him from exercising the proper judgment and, as the court is aware, the consequences of this offense have had, and will continue to have, broad sweeping effects on his life, on his ability to earn a living, and on many future activities which are hampered by a felony conviction—especially a felony conviction of this nature.

## ARGUMENT

In determining Mr. Chin's sentence, this court is directed to consider "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as the need for the sentence imposed to (1) "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," (2) "afford adequate deterrence to criminal conduct" and (3) "to protect the public from further crimes of the defendant." *See* 18 U.S.C. § 3553(a)(1), (a)(2)(A)-(a)(2)(C). In support of his argument with regard to the relevant considerations, Mr. Chin offers the following:

## I     NATURE AND CIRCUMSTANCES OF THE OFFENSE

The pre-sentence report prepared by Probation Officer Michael Penders describes the criminal activity of Mr. Chin. What Mr. Chin did was really quite simple.

There is, obviously, a much longer version of this story. The longer version relates to Mr. Chin's depression and sense of hopelessness as outlined above. As Dr. Hendricks notes in his concluding remarks, "[i]n my professional opinion, to a reasonable degree of psychological certainty, the features of Mr. Chin's combined diagnoses of Dysthymia and Major Depression likely contributed significantly to the behaviors that resulted in his arrest." Report at 8.

In considering the "nature and circumstances of the offense" under Section 3553(a)(1), we urge the court to recognize the offense for what it truly was. It was wrong. It was illegal. But, it was the result of a man suffering from severe depression, who had taken to drinking heavily as a form of self-medication for his depressive symptoms.

## II.     HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Mr. Chinn is 37 years of age. As the Court can see from the presentence report and the letters from Mr. Chin's wife and parents, he was driven to obtain a good education and, even with his failures in the workplace, always tried his best to maintain employment to support his family. From an early age, Wei was generous with his time and what little money he had. The letters from his parents and wife are replete with stories demonstrating his goodwill and kindness, always going out of his way to help others.

As the Court can see from the numerous letters of support, attached as Exhibit Five, Mr. Chin is loved and admired by relatives, friends and co-workers.

Even given the nature and circumstances of this offense, viewed in the extremely ugly picture painted, Mr. Chin's family still stand beside him. All those who know him, regardless of

how upset they may be with him by the actions which bring him before the court, they still stand beside him.

There is no question that Mr. Chin's conduct in this case was wrong, but it was not the conduct of a man with an evil heart or a person who believed that he was above the law. Aside from the conduct in this case, Mr. Chin has been a law abiding citizen who has been devastated by these charges. The history and characteristics of Mr. Chin mitigate in favor of a lighter sentence.

### III    THE NEED TO REFLECT THE SERIOUSNESS OF THE OFFENSE, PROMOTE RESPECT FOR THE LAW, AND TO PROVIDE JUST PUNISHMENT FOR THE OFFENSE

Again, we submit that Mr. Chin's long history of employment, devotion to family, lack of criminal history, along with the fact that he not only admitted his guilt early on, but has attempted to cooperate with the government by providing information about other individuals who have violated the law, and will suffer the consequences of being a convicted felon, will be required to register as a sex offender for a minimum of 15 years and will be deported after service of his prison sentence, are all sufficient punishment to reflect the seriousness of his involvement in this offense and to promote respect for the law. We respectfully submit that a period of incarceration in a range of 18 to 20 months satisfies all of the objectives of § 3553.

### IV    THE NEED TO AFFORD ADEQUATE DETERRENCE TO CRIMINAL CONDUCT

We submit the same factors listed above to promote respect for the law and to provide just punishment also afford adequate deterrence to criminal conduct. Clearly Mr. Chin has been deterred. The shame and humiliation he feels, even if there were no other consequences, would serve to deter him. A felony conviction, the civil liberties one loses after a felony conviction and

overall public humiliation are enough, given the facts of this case, to deter criminal conduct by others. Given the unique circumstances of this case, we respectfully submit that, while prosecution and punishment are necessary and important, a lengthy period of incarceration is not needed to ensure that others do not fall victim to the series of events that pushed Mr. Chin to commit this crime.

## V.    THE NEED TO PROTECT THE PUBLIC FROM FURTHER CRIMES BY MR. CHIN

There can be no real dispute that there is no need for a lengthy period of incarceration in this case to protect the public from future crimes by Mr. Chin. Mr. Chin's arrest and his involvement in the criminal justice system, along with the conviction and attendant consequences, is more than sufficient to ensure that he will never again make a bad decision with respect to any illegal conduct. This has been a hard learned lesson for Mr. Chin. The public needs no protection from him. Since his arrest, he has cooperated with the government in every aspect and been truthful with government agents and the Probation Office. As a registered sex offender it will almost impossible to commit the type crime for which he was arrested. Further, Mr. Chin is open to treatment for his depression and alcoholism, including antidepressant medication, individual and group psychotherapy, and substance abuse treatment. Treatment for his illness will suffice to protect the public from future criminal activity.

## VI.    MR. CHIN'S COOPERATION

We will leave for the sentencing hearing the description of Mr. Chin's attempts to cooperate with the government, but do alert the Court to the fact that he has met with the Assistant United States Attorney and various police officials. As of this writing, we are scheduled for another debriefing and only then will a decision be made as to whether there is a

possibility that a departure motion may be filed pursuant to USSG 5K1.1. Even if no such motion is filed, post *Booker*, the Court may consider his attempts at cooperation in determining the appropriate sentence under the now advisory guidelines.

## CONCLUSION

The advisory sentencing guideline range in this case, based on a criminal history I, with an offense level of 23, provides a guideline range of from 46 to 57 months. Obviously, the Court, by recent Supreme Court decisions, is required to consult the guidelines.  As we indicated earlier, there is a statutory command to impose a sentence "sufficient but not greater than necessary" to achieve the specified purposes of punishment.   This principle, has been a central theme in American criminology since the framing of the Constitution.

Considering all the factors of 18 U.S.C. § 3553(a), as outlined herein, along with the regret, remorse, sorrow, humiliation and despair that Mr. Chin feels for his conduct in this case, we respectfully pray that the Court sentence him to a term of incarceration somewhere in a range of 18 to 20 months.

We do not arrive at this figure lightly. First, since Mr. Chin will be deported he is not eligible for 6 months of halfway house placement at the end of his incarceration. Given the dictates of *Smith, supra,* we respectfully submit that the Court should begin its consideration of a strict guideline sentence at 40 months.

Second, due to the severe alcohol problems developed by Mr. Chin, as documented by both the probation office and Dr. Hendricks, Mr. Chin would be eligible for a substance abuse program. While Mr. Chin will no doubt avail himself of the benefits of this Department of Corrections program, since he will not be able to complete the final portion of the program that

11

must take place while in halfway house placement, he will not be able to benefit for the one year reduction in sentence. Thus, we respectfully submit that another 12 months should be taken from the advisory guidelines, resulting in a starting number of 28 months.

Finally, we submit that the attempts at cooperation with the government, combined with the depression that was clearly a contributing factor in the criminal behavior should result in a further reduction of from 8 to 10 months. A sentence of from 18 to 20 months, especially given the requirement of sex offender registration and lengthy supervised release is more than adequate to meet all the goals of sentencing.

We submit that a sentence which does not require a lengthy period of incarceration is, given all the circumstances of this case, given this crime and this offender, not only fair and just, but also reasonable.

Respectfully submitted,

_____/s/_____
G. ALLEN DALE  954537
601 Pennsylvania Avenue, N.W.
Suite 900 - North Building
Washington, D.C.  20004
Telephone:  (202) 638-2900
Facsimile:  (202) 783-1654
gallendale@aol.com

# EXHIBIT ONE

June 10, 2008


The Honorable Henry Kennedy

United States District Court Judge


Dear Judge Kennedy,


We are Wei Chin's parents. We were both educators before retirement. I, Naifang Wang, the mother, was a high school Chinese teacher for 43 years. Baoqi Qin, the father, was a history professor for 48 years. We are shocked and devastated by the news that our son, Wei Chin, was arrested on February 15, 2008, because of his intention to engage in illicit sex with a perceived minor.


With honesty and sincerity, we would like to present you who Wei Chin was in the past 38 years, including his virtues and weaknesses. We hope Your Honor can have a better understanding of Wei Chin after reading through our statement, and give him leniency in the judgment.


Wei Chin grew up in Beijing, China. He spent 27 years there up until he came to United States for graduate studies in 1997. He likes to read and write. He is kind, honest, and full of sympathy and love. He respects teachers and parents, and he loves his wife and daughter.

1

Wei Chin attended Fuxue Elementary School, one of the best public elementary schools in Beijing, and Jing Shan School, a well-regarded junior high and high school in Beijing. His elementary school teachers, Ms Fenghe Gao, appraised him as a student with honesty, kindness and a big heart. In spring 1981 while he was in 3rd grade, Wei found a valuable watch on his way to school. The watch was very rare back then in China, and was worth around 500 RMB, an amount equivalent to my annual salary at that time. He handed over the watch to the superintendent, who later found the owner of the watch, a senior engineer. On March 5th, 1981, the local TV station interviewed him, then made a program on his story.

Wei started to play volleyball in 1981. He played as primary attacker for 3 years, and then played as setter in junior high and high school. He attended several city wide and nation wide tournaments with his school team. The team he played with had won several titles over the years. He himself had been selected the best primary attacker in 1983 and the best setter in 1989.

Wei was also an active participant in community services. There were two couples, all seniors in their seventies, living in our apartment building on the 4th and 5th floor respectively. Since there was no elevator in the building, Wei helped the two families carry grocery bags, up to 50lbs rice bags, and cooking gas tanks for years

Wei also enjoyed reading and writing. During his junior high years, one of his writings, "I've grown up", was selected as one of the best among hundreds from students out of 13

2

best schools all over the country, and was published in a nationwide circulated magazine for junior high and high school students.

During his high school years, his mini novels, "Empty Seat", was published in a newspaper circulated nationwide for high school student, and was later selected one of the reading material in high school Chinese textbook.

His high school teachers, Ms Qizhong Ma, Ms Fugong Sun, and Ms Shuping Liu, commented him a great team player, a passionate young man who was always willing to offer help to his classmates at any time. Wei volunteered to serve the class to prepare equipments before each P.E. class and help teacher organize P.E. class activities for six years.

Wei started his college at People's University in 1990, majoring in English. Upon graduation in 1994, he started working for China International Travel Agency for 3 years. At the same time, he was preparing for TOFEL and GRE exams. In summer 1997, he was admitted by the School of Hotel Management at University of Massachusetts, Amherst, with scholarship. He came to United States in August 1997, full of hope and ambition. He graduated with a master degree in Hotel Management in 1999. He then continued his study in Management of Information Systems in University of Maryland, College Park. He graduated with another master degree in 2000.

We watched Wei growing up during the 27 years while he was in Beijing. Wei never had any criminal record in the 27 years in Beijing.

Wei spent almost 11 years in United States since he came in 1997. In 1998, his wife, Fang Wu, came to United States as well to pursue graduate studies. They supported each other, cared for each other, and encouraged each other in tough times. Other than working as graduate assistants, they seek opportunities to work on various summer jobs on campus. Wei had taken room service job in school hotel in UMASS, had worked the whole summer to install cables in all dormitories on campus. He had also worked for the biology department to clean hundreds of tubes and bottles, and to make food for flies. Wei and Fang had never asked a penny from us while they were in school.

Wei started his first job in United States in June 2000 with a startup company in Massachusetts. A year later, he sponsored us to come to the U.S. to visit. He bought us round trip air tickets, and drove us all over east coast. He took us to New York, Boston, Washington D.C., as well as well-known universities such as Harvard, MIT, West Point and Princeton. He took good care of us in the trip, and introduced us American cultures. The three months we spent in United States in 2001 with Wei was the best experience we had ever had.

After 9/11, Wei called home, sad, feeling terribly sorry for those lost in the disaster. He donated blood in the afternoon of 9/11. In order to locate a former co-worker from Taiwan who was working in one of the Twin Tower that day, he tried all the means he

4

could think of, and spent couple of sleepless nights, and was eventually relieved when he found out his friend escaped the disaster.

In 2003 during SARS, he mailed us goggles and masks from the States, called and emailed us almost everyday, worrying about our safety.

In fall 2004, I had an operation because of cervix cancer but I didn't tell him until after the recovery. Once he learnt the news, he flew home right away in March 2005.

On his way back to United States in March 2005, he met a gentleman in his 70's on the plane, traveling alone, with no knowledge of English. Wei helped him fill out all the paperwork, took him to the gate for his next flight, and gave him $20 so that he could use as tips. He then met another lady in her 60's at O'Hara airport asking him how to change flight. Wei took her to the gate and gave her another $20. He almost missed his own flight by doing so.

The gentleman and the lady insisted getting Wei's phone number in Beijing. They then called us to express their thankfulness. The gentleman asked his son in Beijing to visit us. The lady visited us during holiday after she went back to Beijing. The lady told us Wei told her he felt obligated to help since they were like his own parents when he saw them. He was sure someone else would have offered help as well had his own parents traveled to a foreign country on their own.

Wei never missed sending his greetings to us for holidays and our birthdays. Once his daughter was born in September 2006, Wei sent us pictures, emailed us and called us every week to talk about her growth.

Although those were small things not worth mentioning, we were pleased to see Wei is still the kind, warm-hearted person we have known for 35 years.

Aside from shock and sorrow, we, as parents, feel that we should bear the responsibility for the mistake Wei made as well.

Wei has shortcomings in his characters: sometimes he acts out of impulsion without thorough thinking; in certain occasions he lacks self-discipline. He is not prudent enough, and sometimes can be quite arrogant, thinking he can handle everything all on his own. He seldom consults family when he has problems, let alone professionals. We are aware of those defects but we fail to help him correct them over the years.

Wei was under enormous stress over the last seven years because of losing his job consecutively. He lost confidence in his ability to well establish himself in his career. Even more, he lost hope getting through his immigration process over years of uncertainties and endless waiting. Feeling failed and depressed, he could not well adjust himself to the ups and downs in life, and lost the ability to handle family stress properly. With no close friends around to talk about his issues, he started to seek comfort and excitement from cyber world. Lacking self-discipline, he was carried away with his

6

whims, acted recklessly and committed the crime. Unfortunately, we, as parents, had no idea about his problems and his struggling in life over the past seven years. All we knew from his phone calls and in his emails was the bright side of his life. We thought he was making a decent life in America, building a beautiful family with his wife, and they were both on their ways to green card. He never told us anything every time he was fired or laid off from his job. Obviously he did not want us to be worried about him. Consequently, we knew nothing about his anxiety, his worries, his fears, and his depression. We had no idea there exists big contrast between his dreams and his reality. We feel so sorry that without full knowledge of what he was going through, we failed to offer him any advice, help, or even talk in the time he needed it. Because of that, we feel responsible for his mistake as well.

Wei was writing home almost everyday from jail, and called home whenever possible. He was crying hard every time we were on the phone. He was repenting in his letters to his wife, his daughter, and his parents. He introspected himself, self-examined his behavior and his state of mind. He is extremely regretful and feels deeply sorry for the consequence he brought to the family. At the same time, he is determined to re-establish his family and his career in the future, to respect the rules, to be more self-disciplined at any time, and to communicate more with the family. We feel his deep sorrow and his sincerity in his words. We also feel his deep love to his daughter in his poems he wrote in jail to his daughter.

We are both in our late years. I had an operation because of cervix cancer in 2004. Wei's father has heart disease and high blood pressure and was depending on prescription drug daily. We hope Wei can return to the family as soon as possible, stay with us, and take good care of us. At the same time, we will devote our love to him, support him, advise him, remind him of the past, and encourage him for the future. We believe that given the chance, Wei will learn hard from this big lesson, never ever break the law, rebuild his life with his wife in Beijing, and contribute his best to the society.

We sincerely wish Your Honor will evaluate Wei Chin from a broader perspective, take our plea into consideration, and give him a chance so that he can have a more productive life in the future.

Sincerely,

Naifang Wang (Mother)                    Baoqi Qin (Father)

EXHIBIT TWO

July 12, 2008


The Honorable Henry Kennedy

United States District Court Judge


Dear Judge Kennedy,


I am writing to you to admit the crime I am charged with. My behavior was irresponsible,

despicable, reckless, shameful and lunatic. My behavior was against my own principle

and conscience. I denounce what I have done. There is no excuse for my wrong-doing,

and I truly regret it.


Please let me recapture what have led me to this stage of my life. I was having a normal

life before my arrest: I was working full-time as a programmer; I paid tax every year; I

donated blood in the afternoon of September 11th, 2001; I donated goods and money to

charity; I helped friends financially and spiritually when they were in need. I did

everything I could to be an active member of the community. I have a beautiful wife who

I met 18 years ago when we were in college. We recently had a lovely baby girl Claire

who is now 22 months old. However, underneath the seemingly happy surface, there are

disturbing under-currents.


I need to mention two intertwined themes that ran through my life: my career and my

marriage.


1

1. Career Crisis

I didn't have a "career" in a normal sense. Instead, I had a work history composed of disparate jobs with long gaps in between. Over the past 6 years, I lost 7 jobs, the shortest being 2 weeks, the longest 28 months.

I have been working in the Information Technology industry as a computer programmer. By nature, I am a sensitive, emotional person. I was not interested in nor had a passion on computer programming. I blundered into this deep-water profession by accepting a job as software engineer in a start-up company in 2000. I worked there for seventeen months, during which time I constantly struggled with abstract symbols and code snippets. Despite my strenuous efforts to keep the job, I was laid off in November 2001, partly because of the financial difficulty the company faced, partly because of my poor performance. Upon being laid off, I faced a dismal situation. I had little technical skills, no green card, and the timing was two months after the 9/11 attack. The second job did not arrive until 8 months later, and it turned out to be a mishap. Yet another start-up company in NYC, my employer assigned me to develop some cell phone operating software. With neither training nor preparation, I stayed on the job for only two weeks before being fired. I started my third job with Mount Wachusett Community College in Massachusetts in August 2002, only to be laid off again 10 months later due to budget cut in state of Massachusetts. This job-losing pattern cursed me like catch 22 in the following years. Without a job, I could not build an impressive resume; without an impressive resume, I would not get hired anywhere. To make things worse, fewer and fewer

2

employers were willing to sponsor the working visa I needed in order to work legally. In those days, I managed to keep my nose barely above the water by grabbing whatever job offer I could possibly get. Those were mostly low-level jobs in 4 or 5 people companies. My career became a washing machine to me: it looked like I was moving, but I was simply not going anywhere. I did not care about the low pay or the long working hours. There was one time my bossed lowered my salary by $10,000 simply because I couldn't finish the project as soon as he wished, even though I put in lots of hours at nights and on weekends. I was angered, humiliated, yet I didn't quit, since I needed a job. All I cared about was that a job would keep me from being out of my non-immigrant worker status. Bearing the hefty costs of getting a work visa myself, I basically worked for nothing during the first two months into each of my new jobs. During the long, agonizing gap between each job, I sometimes cried and screamed in nightmares, only to wake my wife and myself up. Each morning, as I watched people driving off to work with hurried excitement, I felt infinite emptiness and self-pity. Months passed by, the confidence and pride I had built up over the years gradually eroded away. Insurmountable sense of failure and despair covered me like a cage. I was depressed. When I was unemployed, depression was in its simplistic way. However, when I did have a job, my depression did not go away. Instead, it deepened. I was in constant fear of losing my job. Each and every time my manager called me in for a talk, I was worried I could be fired. I was in a guessing game, trying to figure out my boss's mood for traces of firing me at any time.

Between 2001 and 2005, I lost 5 jobs. Yet I did not give up. I had a faith, believing things would improve in the future. The patience paid off in July 2005 when I got an offer from

3

Computech working in FCC as a contractor. My wife and I bought a house. Soon after we

had a baby, and I was on my way to get my green card. The good time lasted 28 months.

Last year, I took the initiative to work on a high-profile project in FCC, eyeing a better

career opportunity inside the company. What I did not foresee, upon accepting the

assignment, was the tight deadline that came along. I had three months to work on the

project from paper proposal to the final delivery of the product. As the deadline loomed

closer, I was still working on many technical details. Without permission, I installed

software on my office computer, allowing me to be able to work from home. I hoped to

finish the project without causing any drama. Things worked out just the opposite way.

My unauthorized access to office computer was detected. The security personnel were on

their way to check my computer. I panicked. Under the intense fear of losing my job, I

deleted the software I installed, even though I knew clearly I was only making things

uglier. Once the internal investigation completed, I was fired on November 16, 2007.

After walking out of the federal building for the last time, I sat in my car until the outside

turned completely dark. I could not figure out a proper way to tell my family what had

happened. The ground underneath my feet started cracking open.

   2.  Marriage Crisis

Another side of my life, my marriage, did not work out well either. I began to drink

alcohol excessively after I lost my first job in November 2001. Months gone by, I still

could not even get an interview. My frustration level increased, along with my alcohol

4

consumption. Over the past 6 years, I had altogether 20 months being unemployed. During these days, I typically spent the day by drinking, watching TV, or chatting online until my wife came back from work. I made up my mind many times to give up the addictions, but failed equal number of times. Depending solely on my wife's meager income while between jobs, I felt living like a parasite. Each time when we touched on the topic of how I could better use my time, we had a quarrel. Over the years, our marriage deteriorated as mutual hostility grew and intimacy diminished. My career instability and addictions on drinking and chatting all played a part. I used to be her hero, but as I lost jobs so frequently, my ego dwindled to a 3.5 inch clown. Whenever I looked at my wife's eyes, I saw the reflection of that clown. It felt like my paper-thin self-esteem got punched with another pair of holes by her eyes.

In 2005, after I started working for FCC, we decided to have a baby, as part of our efforts to heal the relationship. The baby was born in September 2006. Everything seemed perfect up until we invited my mother-in-law over to help taking care of the baby. It was the beginning of a bitter, conflict-ridden year. I was in daily confrontation with both my wife and her mother over numerous household issues. Each time I stepped into our house after work, I had the feeling of entering a battlefield. After several serious confrontations, my mother-in-law and I stopped talking to each other. The relationship between my wife and I dropped to all time low. My wife once suggested we seek help from marriage counseling professionals. I refused. My way of avoiding conflicts was to hide in the basement, chatting to strangers. Instead of seeking help from professionals, I turned to strangers for emotional comfort that lacked from my family life.

5

In the adult chat rooms, I appeared as an eager, delighted chatter, hiding my gloomy mood behind the computer. I tried to be as jaunty as I could, hoping not to scare off people I was talking to.  Over a few weeks, I added dozens of chat friends. My friends were at different ages, from different walks of life, including the fictitious character "Mandy Poole". I would like to stress that I have never targeted any age-group. I talked to whoever chatted with me indiscriminately. As the gap between my wife and I widened and deepened, I became emotionally closer to my chat friends than I was to my wife. From the hinder sight, I realized how heartless, how senseless and how selfish I was at that time. It was my wife whom I called for help after I was arrested; it was my wife who shouldered all the embarrassment and emotional pains I brought to my family; and it was my wife who supported me, helped me in the time of most needed, even after my betrayal to her in the most shameful way.

There are two chat sessions involved in my crime:

1.  First Encounter

In June 2007, I saw the fictitious character "Mandy Poole" in an adult chat room. I sort of remembered that we had a very brief conversation before, some time earlier than 2007. After meeting this person online again, I kept chatting. On one hand, because of the NBC "Dateline" show which aroused immense curiosity in me, I was curious to find out if this character was actually a police officer. To me, it was thrilling to act as an online Sherlock

6

Holmes. I regret my stupidity for playing with fire only to be burnt badly later on. On the other hand, subconsciously, I wanted attention from people I chatted with. I had been such a "nobody" all my life that I did not care where this deadly attention came from. As message going back and forth, I started to trust this person more and more. I even started to think that this character really liked me. However, I knew clearly it is a serious crime to agree to have sex with someone under 18. I therefore exercised my adult conscience by explicitly refusing to have sex with such character who I perceived to be a minor.

2.  Second Encounter

After losing the government job, I was depressed, but not defeated. I knew I had hope: I still had many opportunities, thanks to the work experience accumulated all these years, along with the work permit I received recently. I was correct. Within two weeks, I was working again. This time I worked in a medical data analysis company in Annapolis. To make sure I didn't mess things up again, I obtained approval to remote access computer at work so that I could work from home during free hours. I worked very hard and earned impression and recognition since day one. Tired of losing jobs, I wanted to settle down and make a long-term commitment. However, job insecurity kept haunting me from the fresh experience I just had not long ago. I could not help but envisioning being fired by my new boss at any moment. That day came at the end of the 7th week on my new job, the reason being my non-U.S. citizenship made me ineligible to work on the government contract the company had recently signed up.

7

Unspeakable sense of disillusion and failure consumed me, as I stepped out of my 7th job within the past six years. It seemed no matter how hard I tried, I was born to fail, and the reality kept proving it. I was asking myself why I should live so long to endure such hardship. One day, sitting in the darkness, my wife and I had a serious talk over our lives. She was worried about the worst. She worried about me losing my mind and hurt her and our baby. I repeatedly assured her it was absolutely impossible. My wife felt relieved and went to sleep with the baby. As she disappeared behind the door, I started to ask myself: would I hurt myself instead?

Another incident took place on February 1, 2008, when I was driving back home from an interview. I was involved in a road rage. After impatiently passing a car bearing the tag number "EGE030", the driver started making hostile gestures, and followed me all the way to my community. Fearing the guy could harm my family, I turned around and headed toward the nearby police station. I called 911 for help. The guy fled away before the police arrived. I became paranoid afterwards. I suspected someone was going to harm my family in a horrible way. I became silent, testy, and at times, unpredictable. However, I kept denying I had any psychological problems. To me, admitting such problems meant nothing but admitting myself as a loser.

I was depressed all these years. The new wave of depression following the recent job losses triggered an enormous psychological avalanche that had been piling up during all these years. I not only lost couple of jobs lately, I lost hope. I lost the hope that I had been upholding all these years. I had to accept the reality that tomorrow may not always be a

8

better day. The disillusion became the last straw falling on camel's back. I resumed

drinking and chatting, in order to escape the reality. I did not realize until now, after

behind bars for several months, that by going back to chatting, I dug a huge pitfall for

myself. I exposed the most fragile side of my personality, during the most unpredictable

moment of my life, to the exterior world. I blame myself for looking at the wrong

direction when trying to deal with my personal failures.

"To make me feel better" was the only idea I had as I looked for people to chat with in

the afternoon of February 13, 2008. None but one was online – "Mandy Poole". The

name was familiar. By sending a greeting message, I started the most fateful episode of

my life.

Reading the chat log after my arrest, I realized that a corrupted part of me already existed.

I was looking for sex outside of my marriage to begin with. Under normal circumstances,

logical thinking, reasoning and fear of consequences for breaking the law would help me

take age factor into consideration. They all served as solid checks and balances during

any and all decision-making processes. I had the temptation from the same person last

year, but it did not go far. However, the abrupt termination from Computech cast a far-

reaching shadow that I could not walk out of. On the day I saw "Mandy Poole" online, I

remembered this person lived less than a mile from the FCC building, the place where I

used to work. Couple of months after the firing, I was still buried by the regret and grief

over my mistake that cost me my job. Emotionally, I was still attached to the job I

cherished so dearly, the job that had been the pillar of my life for the past two years. An

9

urge came through my mind. I wanted to make myself feel better. The urge was so destructive and powerful that it ran down like larva, melting away my rationale. I felt a part of me was rapidly dying. I needed something to hold on to, just like a drowning person needing a reaching hand. I was doomed to do something I would have never done otherwise, and it was only a matter of time before I did something to destroy myself. I sort of remembered I had briefly met this person online before 2007 once, so I had the impression the character was now older than 14, although I knew she was still under 18. I did not try hard enough to find out exactly how old this person was; I ignored the age factor; I ignored all the rules and code of ethics. All I had in mind was talking to and possibly dating someone would make me feel better. Visiting this particular character would bring me closer to where I used to work, giving me an excuse to make a "home coming" journey. This character, no matter how old or young, became a symbol of my lost hope, the acceptance I craved for so long, and the "reaching hand". I projected so much of my long-time suppressed feelings onto this fictitious character that it eventually overpowered all the principles, taboos and rationales in my mind. The rest became my criminal history.

By committing this crime, I betrayed my wife, who loved me and trusted me since we met 18 years ago; I betrayed my family I vowed to protect and defend; I betrayed the universal values I was born and raised with; I betrayed all human social norms and conscience; I betrayed United States of America, the country I loved so much, the country that welcomed me with open arms 10 years ago.

I want to apologize to my wife, to my parents, and especially to my 22-month old daughter Claire. I want to apologize to the society, and apologize to the United States of America. I have committed the most despicable crime among all crimes, and I am deeply sorry and regretful.

I am regretful not only because I am suffering the excruciating pain from missing my baby, my wife and my mom, not only because I am suffering from all other irreversible consequences of my crime, but because my behavior is fundamentally wrong. I will never ever do anything that breaks the law again in the future.

There will be an end to whatever punishment I am getting, but the guilt and shame will accompany me for the rest of my life, and go beyond.

I am grateful to many people and things: I am grateful for being alive; I still have the love and support from my family; I am grateful for the humane treatment in the jail; I am grateful the police stopped me from slipping further on the road of no-return.

Now I am writing to Your Honor, with all my sincerity and honesty, with all my humbleness and courage, with all my fear and hope, I am begging your mercy. Please judge me not only as a despicable criminal, but also as a weak human being who made a horrific mistake while trying to solve his problem at the wrong direction, a person with a good, kind heart but a chaotic mind, a person who suffered from so many failures that he even failed to handle his own failures.

11

A simple flicker of mind costs me so much that the irreversible consequences of it have already accounted for multiple life sentences to me: the American Dream that I had upheld and fought hard for so many years shattered; my crumbling marriage has come to a point that may be beyond repair; I am facing the most terrible possibility that my baby might be taken away from me for the most part of her life if my wife decides to raise and educate our daughter in this country. However, given me another chance to start my new life in my home country, I am determined to prove to my wife and my daughter that I will rebuild myself, be responsible, work hard and give them the best life I can. So please Your Honor, let me pay for my wrong-doing in a merciful way, allow me to prove what I said, and fulfill what I promised.

Sincerely,

Wei Chin

EXHIBIT FOUR

June 15, 2008


The Honorable Henry Kennedy

United States District Court Judge


Dear Judge Kennedy,


My name is Fang Wu, Wei Chin's wife. I have known Wei Chin for 18 years, since I was

18 years old. We have been married for 11 years and have a 21 months old daughter

Claire. Wei is a person full of dreams and passion, a person with a warm heart. He works

hard, respects people around him, is patient to his wife, and loves his daughter deeply.

However, Wei is always struggling with his career. The setbacks in his career cause

frustration in his mood and tension in the family.


I got to know Wei in 1990, when we just started our college in People's University in

Beijing, China. We were in the same class, both majoring in English. He was a school

volleyball team player, full of humor, and an active member of the Poetry Association on

campus. During the orientation week, he made several trips to the school bookstore, on

his bicycle, and voluntarily carried all the textbooks from the school bookstore and

delivered to everyone. Since lots of our classmates were from other cities, including me,

he invited us to his home on weekends. His parents would prepare nice dinner for us, so

that we wouldn't have to spend our weekends missing home, feeling lonely.


1

We married in 1997, three years after graduation. We both had the same dream back then: go to United States, learn American culture and ideology, experience democracy and freedom in the most developed country in the world, at the same time face new challenges and find new opportunities which can bring us a better life. The only way for us to go to United States was to apply for graduate school. We prepared for the TOFEL and GRE exams together, and applied for schools with our limited savings. In August 1997, Wei came to United States to study Hotel, Recreation and Tourism Management with scholarship from University of Massachusetts, Amherst. A year late, I came to UMASS to study MBA.

Other than being a teaching assistant 20 hours a week, Wei took whatever job he could find on campus to make ends meet. Once he took a job to clean bottles and make food for flies for the Biology Department. It was quite a labor work, and the working condition was hot, dirty, with rats running around. While he was working, I sat aside watching, chatting with him for a whole night. Poor as we were, we still had a good time simply because we were together.

Wei makes friends from school, work and church. Wei is always reaching out when his friends are in need. One time a friend of us was feeling pain in his stomach when he was visiting us. He was feeling so painful he couldn't even stand up. Wei took him to the school emergency room right away, and spent three hours with him that night. Turned out our friend was having kidney stone. When our friends Ed and Jon each got married and had their babies, Wei sent gifts and money. When Ed lost his second unborn baby, Wei

2

made several calls to his friend and sent money again. Wei built website for his friend

Ted so that when people search acupuncture in Bethesda they would find Ted's practice

as the first link on Google website. Wei helped lots of his friends to clean virus from their

computers. Wei enjoyed doing this and he was doing this all for free. In the afternoon of

9/11, Wei was among the first in his company to donate blood. Later, we donated money

on Red Cross website.

However, Wei never had a smooth ride in his career. Wei pursued another degree in

Management of Information Systems in University of Maryland, College Park, partly

because I talked him into it. With limited career choices for foreign workers, I was

assuming it would be easier for us to get an IT job. We now realize it was a bad career

choice for him. A passionate and impulsive person, Wei was never good at programming,

and he never liked it. Although he worked hard and tried to prove himself from day one,

he never got used to logical thinking. Lack of proper training, plus lack of luck after 9/11,

Wei lost his jobs several times, either by being laid off or by being fired. The worsened

economy made it even hard for a foreigner to find a job since fewer and fewer employers

were willing to sponsor working visa. It took Wei 8 months to find his second job, only

to be fired in 2 weeks because he was under-qualified for being a software engineer. He

was laid off from his third job because of the budget cut in Massachusetts. Wei later

accepted any offer he could find, as long as the employer was willing to sponsor his

working visa, regardless of whether he liked to job or not, or whether he was capable of

doing the job. He tried hard to stay on the job, worked overtime at nights and on

3

weekends, even after his boss decided to decrease his salary because of his inability to deliver the project fast enough.

Every time Wei lost his job, it caused great tension in the family, not only financially, but emotionally (Wei never applied for unemployment benefits, in fear that it would impair his green card process later on). I even started to imagine the day he got fired or laid off even on the first day he started his new job. I was in some way waiting for that day to come. My heart trembled every time he called from work, worrying it might be another bad news. Once he lost his job, I became extremely frustrated, uneasy, and yelled at him. I told him how hard it would be for me to work with extreme care and dedication, praying it wouldn't be my turn to get laid off the next day. For in case I lost my job, both of us would lose legal status in this country, and that meant all we had dreamed of and fought for over all these years would be in vain. We thought it was shameful going back to China with no green card. Even when Wei had the idea of going back after losing several jobs, I insisted not to. When Wei found a new job, I pushed him hard to either find a better one with a better pay, or to work projects that could enrich his resume.

The disaster came in November 2007, a week before Thanksgiving. Wei was fired from Computech, a company he had worked for more than 2 years. Wei took my advice to seek transfer to a department which needs more development in Java and project management. I warned him the technology used in his old department was so obsolete that there was no chance for him to find a new job in the future if he needed to. Once his request got approved, Wei was excited. However, once he started his job, he talked less

4

and less and spent more and more time on his computer working. At first he emailed

home his documentation and project design so that he could continue working on

weekend. Later on, as you might know, he installed software which allowed him to

access his workstation from home. I knew clearly, by watching him, the sense of

insecurity and the fear of being fired for not being able to complete the project on time

came back hunting him again. That fear was looming inside of me as well. Sadly, he was

indeed fired, eventually, not because he was unable to finish the job, but because he was

too eager to finish the project his very action to remote access his workstation was

against company policy. I still remember the night he came home late, talking to his co-

workers on the phone for hours. Later on he told me the truth when I asked him why he

was talking for so long. My heart sank and my mind went blank. He told me his co-

workers were calling because they were afraid he could do something stupid to himself.

Since his parents were visiting us at that time, we tried hard to hide the truth from his

parents for a whole weekend. Under the calm surface, I criticized him vehemently for his

stupidity and imprudence. I pointed out his green card application could easily be

jeopardized since the filing of his I-485 was less than 180 days. That meant the final

stage of his green card application, after years of frustration and endless waiting, could be

rejected or revoked at any time if he could not find a job quick enough. I cried at him for

how hard it would be for me to afford both mortgage and daycare on my own if he was

unemployed for another long period of time. I followed up everyday on his job seeking

status. Luckily he managed to find another job in two weeks. This time he obtained

approve from his new boss to access workstation from home, and started to review

documents and code at nights and weekends again. He told me his boss liked him right

away and was satisfied with his progress. However, bad luck struck him again. He was laid off in just seven weeks from this new job only because he was not a U.S. citizen. I noticed on that Friday night he looked terrible, sitting in sofa, frowning, staring in blank, saying nothing. When I asked, he replied nothing was wrong. The next day he still took the whole family out to dinner as we planned, but he refused to get out of car to go shopping together after dinner, claiming he was tired. I noticed something went wrong when he immediately rushed to his computer after we got home. It was until then he told me that he was laid off again and he needed to start looking for another job. This time I was speechless. I had to admit this is nothing but fate.

Another damage to his life is our deteriorating relationship, especially after my mother came from China to visit us since September 2006. My mother spent a year with us helping us on the baby. During that time, Wei had a very bad relationship with my mother. My mother lived alone since 25 years ago when my father died. She was not used to living with other people, especially when they were not doing things her way. I may have developed depression myself after giving birth, but I never admitted it. All I did was to dump my unhappiness onto Wei. Both my mother and I picked on Wei a lot, on numerous simple household issues. We scolded him for not knowing how to calm down the baby when he was holding her; we yelled at him every time he forgot to wash his hands before touching the baby; we complained about his cooking; we got angry at him every time he forgot to separate baby's laundry from adults'; We got impatient at him for not rinsing baby's bottles thoroughly; we accused him for making more mess even though he was trying to help out. My mother and Wei had couple of intense

6

confrontations. Eventually Wei stopped talking to my mother. There was less and less communications between us as well, let alone intimacy. Later on Wei simply hid himself in the basement once he got home from work. I didn't care too much since I thought it would probably be better for three of us not to stay in the same room at the same time. Now I realized he was probably seeking peace and happiness by talking to someone else online.

I feel partially responsible for the mistake he made. I feel awfully sorry about the way I treated Wei and I regret my behavior. I should have supported him more instead of pushing him; I should have talked to him more instead of accusing him; I should have given him more comfort instead of laughing at him for losing his job so many times. I realize now that green card is actually not the most important thing in my life. It used to mean success, accomplishment, and fulfillment of our dreams. Now it becomes a burden. We are no longer living for ourselves. We are living as slaves of this vague card. Now with the baby, I feel the most important thing in life is actually the intactness of our family. We can be happy, as long as we are together, as we were before, supporting and loving each other, no matter where we are, with or without a green card. Our daughter will be happy, as long as both her parents are around her.

Wei made an unthinkable mistake. He is paying for his mistake, and our family is paying for it as well. However, I truly believe he did it unintentionally. He was going through a tough time in his life, under extreme stress, and confused. Wei is now in great remorse. He writes home almost everyday, with tears and regrets, with love, and with enormous

7

pain of missing his daughter. He wrote couple of poems for his daughter. He is repenting to the family, to the government, and to the society. He also decides to admit the mistake to his daughter in the future, when she is old enough to understand all this.

Wei's parents are in their seventies and are in poor health. His mother developed cancer a couple of years ago. His father had high blood pressure and was in extremely dangerous situation once he learned Wei was arrested

I am asking Your Honor to evaluate him as a whole person, to have mercy on our family, and to give leniency in your consideration.  Please give Wei a chance to correct himself, a chance to pay back the society, and a chance to rebuild our family. Our family will move back to Beijing. Both Wei and I will have no problem finding a job in Beijing. Wei will have all the supports and love from his family and friends. I am sure Wei will be a much better person, a better husband, son and father in the future.

Sincerely,

*Fang*

Fang Wu

8

# EXHIBIT FIVE

4405 East West Highway, Office 600
Bethesda, MD, 20814
(301) 655-1600

Judge Henry Kennedy
United States District Court Judge

May 31st, 2008

To The Honorable Judge Kennedy:

I am writing this letter on behalf of the reputation and character of Mr. Chin Wei. I have known Chin Wei for about eight years now. His wife went to graduate school with a very good friend of mine in my hometown in Massachusetts. Chin Wei then moved down to Maryland so I have had the opportunity to get to know him even more and we have become good friends. Chin Wei has also acted as my computer technician.

Chin Wei is one of the most virtuous people that I have ever met. I noticed this in him right away as he would work diligently on my computer at times and yet never charge me even a dime. Once, he and I drove back to Massachusetts together to visit friends and family. Chin Wei ended up working almost the entire weekend on a friend's computer. I felt badly that he didn't get to relax as much as I hoped he would be able to. I was amazed and impressed that on the way home he did not complain a word. I even asked him about it and his reply was "oh, it my pleasure. I enjoy doing the work." I recall wishing that everyone could be so kind.

Chin Wei helped me design and create my website. I wanted to create a web site for my acupuncture practice in Bethesda, Maryland and Chin Wei helped me become the top searched site on google for Maryland acupuncturists. Again, he did this happily without charging me a dime.

Chin Wei is always talking in a positive tone. I don't believe that I have ever heard him complain about anything. He is generous and kind and always upbeat in every situation. No matter what situation Chin Wei is in I will always speak up on his behalf. Please do not hesitate to contact me further about Chin Wei's character.

Thank you,

Ted O'Brien, Licensed Acupuncturist, George Washington University

May 26, 2008

The Honorable  Henry Kennedy
United States District Court Judge

I am writing to provide a personal letter of reference for Wei Chin, whom I have known for 4 years.

Wei worked for me at Mount Wachusetts Community College, where I was the executive director/Chief Information Officer for the college.

During my tenure with the college we installed and implemented a significant upgrade to the college's ERP system. This upgrade moved the college from a much outdated computing platform and software, to what was the current state-of-the-art hardware and software. As a part of this migration programs had to be developed to support new reporting requirements, and to help the college fully utilize the new software.

Wei's role in the project involved working with other developers and with non-technical college staff. Both of these roles were challenging in their own way. Wei was challenged to learn the new system, build effective relationships with co-workers and internal customers, and to deliver projects on time.

During this period I observed that Wei was a capable programmer, able to quickly grasp the new system's requirements, able to work with co-workers who were not overly helpful, and communicate and work effectively with college administration staff. My recollection of this time is that he was seen as bright, respectful, and a welcome addition to the college community.

Since he reported directly to me, he and I worked closely almost daily on assignments and projects. I found Wei to be very intelligent, a 'quick study,' possessing great attention to detail, and overall a pleasant and capable addition to my staff.

During this period all colleges in the Commonwealth of Massachusetts were under significant budget challenges. As a result of this situation, my authorized staffing was reduced at the end of the budget year, and I regretfully had to eliminate Wei's programming position.

I am happy to discuss my experience with Wei further, if needed, and I can be reached through the contact information listed below.

Sincerely,

John M Plunkett, PhD
john@jmplunkett.com
804 240 1138 [m]

3813 John Carroll Drive
Olney, MD 20832

June 3, 2008

The Honorable Henry Kennedy
United States District Court Judge

Your Honor,

Fang Wu, the wife of Wei Chin, has asked me to write to you concerning her husband.

I have known Wei Chin since about July 2005, when he joined the Computech Web Team based at the Federal Communications Commission in Washington D.C. I have been a member of this team since 2001. Wei was a computer programmer, and remained on the team until he left in November 2007. During this time I was saw Wei regularly, and we shared the same office space with about six other members of the team.

Because of the natures of our respective jobs, I never really worked directly with Wei, even though we were on the same team. However, this did not preclude any interactions with him. I always found him to be courteous, pleasant and friendly. I never experienced any trouble with him – he was never rude or disrespectful in my presence, and as far as I was aware, he was considered a valued member of the team by his peers. I was never aware of anyone complaining of the standard of his work, and I never heard him complain about anyone else. He struck me as a loyal and reliable employee of our company.

I never socialized with Wei outside of company-sponsored events, but at such events he always behaved appropriately and respectfully in my presence. I had the pleasure of meeting his wife, Fang Wu, at the Computech Holiday Party one year.

Wei also provided some assistance with the programming of a web site of a friend of mine, a task which he undertook in his own time, outside of his regular work at Computech. For this I was very grateful.

Sincerely,

Jeremy Woollen

April 27, 2008

The Honorable Henry Kennedy
United States District Court Judge

Judge Kennedy:

Wei Chin worked for me as a software engineer at the software company, Alysis
Technologies, in Holyoke, MA from 2000 to 2001. He was a conscientious worker who
did good work and got along well with his co-workers and supervisors. At that time I was
the Vice President of Product Development at Alysis in charge of Mr. Chin's department.

I never had any trouble with Mr. Chin while he worked for me and hope that you will
consider leniency for the sake of him and his family in your decision.

Sincerely,

Edward Mangiaratti
186 Wildflower Dr.
Amherst, MA 01002
413 256-1148

May 9th, 2008

The Honorable Henry Kennedy
United States District Court Judge,

I worked with Wei Chin from July 2007 to Feb 2008 at the Federal Communications Commission. We were web developers and office mates.

At all times I have found Wei to be a very friendly and hard working guy. He made a new employee such as myself felt welcomed at work. We often talked about our family lives, especially our young kids. He was always available to help, and answer questions coworkers had. Wei was very well liked by everyone in our office.

Besides his friendliness, I admired Wei's diligence at work. He always showed up early to work everyday. He often offered to drive when we wanted to go out to lunch, since many of us commute via Metro.

Wei was a very pleasant person to work with, and a dedicated family man from our conversations.

Yours truly,

Jin Yang
7364 Stream Bluff Way
Springfield, VA 22152

Xiaowei Zhu
3912 Cross Bend Rd
Plano, TX 75023
May 27, 2008

The Honorable Henry Kennedy
United States District Court Judge

Your honor:

My name is Xiaowei Zhu, a reliability engineer in semiconductor industry. I've known Chinwei for more than 20 years. We went to a camping tour together with a group of mutual friends in high school, and we've been keeping in touch all these years.

Contradictory to the twisted criminal you might imagine from the case documents, Chinwei I know of is a good person, who is passionate and idealistic about this world, who is always willing to help others in need.

Chinwei was known for two things in high school, one is those beautiful articles he published in school journals, and the other is his excellent volleyball skill which got him in the school team. Both Chinwei's parents are teachers, and he inherited their passion for knowledge. The first Xmas gift I got from him was a book on western literature.

Chinwei is always very passionate and idealistic about this world. In June 1989, together with a group of high school students, we often biked together to Tiananmen Square to support college students' demonstration of anti-corruption and calling for democracy.

Dream of freedom and democracy brought us to US. Chinwei and I almost follow the same path: we came to US with graduate school scholarship in 1997, found a job after graduation, and started a family shortly after. Over the years we kept our friendship by occasional phone calls and a lunch or dinner whenever a business meeting brought us close. From these communications, I learnt that he has been struggling to keep a job to support his wife and their baby.

As a long time friend of Chinwei, I feel really sad to learn that he made such a big mistake, for which he is responsible, and for which he will pay high price. I'm sure he is in deep remorse now, as this destroyed almost everything he has been working so hard all these years. It sadden me most to witness what his family has gone through.

I hope your honor could get to know Chinwei a bit better through my letter. Chinwei I know has always been a kind and warm person, and he would never intentionally hurt anyone. I hope your honor could give him a chance to learn from his mistake and restart his life. Please do not totally destroy him; give him a chance to be more mature, and more responsible; give his family a chance for them to have a better husband and daddy.

sincerely,


Xiaowei Zhu

Lei Zheng
4434 Kentford Road
Owing Mills, MD 21117

The Honorable Henry Kennedy
United States District Court Judge

RE: Mr. Chin Wei's case

May 25, 2008

Dear Honorable Judge,

I 'm writing this letter regarding Mr. Chin Wei's federal conviction. I want to express my strongest sympathy to Mr. Chin Wei' family for the mishap that occurred a few months back. I understand Mr. Chin has done something a person with clear consciousness should never have done and agree that everybody should pay for the crime he has committed. At the same time, it is quite fortunate that Mr. Chin has not truly hurt anybody. Therefore, I pledge with you, for the merit of his wife, his elderly mother, and his beloved baby daughter, to have mercy on him.

I have known Mr. Chin from *Story Time* in the Eldersburg library of Carroll County, MD in October 2007. I have two daughters and the younger one is almost the same age as Mr. Chin's baby daughter. Both of our families like to enjoy family time with kids on Saturdays so we started talking and became familiar with each other soon.

In my impression, Mr. Chin is a family man. My family had been invited to their home for dinner since we knew them. Mr. Chin is a very warm-hearted host and a wonderful chef. I am especially surprised by his cooking skill. He is a devoted son who respects his parents and makes every effort to make his parents comfortable. He is also a loving father. As I was told, it was always him waking up at night to take care of their baby daughter. He is also quite a gentleman who shows respect to his wife.

I could almost immediately feel that Mr. Chin is a warm-hearted man with a good heart soon after we met. Whenever we had a concern in our daily life, Mr. Chin always offered to help and provided solution to his best knowledge. He and his wife even offered to take care of our kids if we plan to have a third child.

People face hardships in life and make mistakes. The hardships for new immigrants are always doubled or tripled than for others. Mr. Chin had been under tremendous pressure, as I understand. He lost his job soon after we met him. It not only means loss of income, to a new immigrant, it also means other potentially serious consequences, e.g., loss of immigration status, loss of house, and/or being forced to leave the country. These pressures could make a normal person stressful and behavior differently.

While I have only known Mr. Chin for less than a year and cannot speak to his past, I have learned much from Mr. Chin Wei in such a short time and it is for these reasons that I request that

you show as much lenient as possible when sentencing him. His baby daughter and elderly mom need him! He is a dedicated father and he is committed to providing for his daughter. I believe he is not going to be a threat to anyone after he is released.

Sincerely yours,

Lei Zheng



May 29, 2008

**Case: Wei Chin**

**The Honorable Henry Kennedy**
**United State District Court**


This letter is in reference to the case involving Mr Wei Chin. In 2004 Mr Wei Chin was hired by our company to perform some programming and coding work. We assigned him to a specific project that he quickly mastered and became a valuable person for our company.

Being the project manager at the time, I worked with Wei closely and he reported to be on a daily basis; He was a very hard worker, nice colleague and overall very pleasant person to interact with. He had a clear understanding of what was assigned to him and was always open to learning more.

His attitude with people within or without the company was very professional and we only got very good feedback from his interactions with others; no one reported anything strange or illegal from his behavior, his online and offline activities were the ones of a qualified employee and we were happy to have him.

When Wei's wife contacted me about this case, I was surprised and could not believe what I heard. This person that was described to me was different from the Wei I know and I immediately said to myself that he must have been going through very difficult times to act like this.
Having known two teenagers who had been abused I the past, I felt uneasy about the situation, but after talking with the teenagers, I came to the conclusion that he does deserve a second chance as he is not a bad person.

I truly hope the best for Wei, his wife and their little daughter. I am sure that Wei is very regretful and that he won't do this again. I would be happy to give more details or insights on the character of Wei if needed.


If you have any further questions or would like to discuss this matter, please contact me.


Sincerely,

Charles de Vilmorin
Director of Marketing

The Honorable Henry Kennedy
United States District Court Judge

Your Honor,                                                          May 26, 2008

It's not easy to write this letter.

I currently work as the Technical Architect of the Financial Support Group of FCC through
CompuTech. I was Wei Chin's technical lead on the Debarment project in 2007.

Before Wei came to join our team, he worked for the web team for about two years. A few of the
colleagues (including Wei and me) would go out for lunch once in a while. In my impression, he
was a funny man: he made the surrounding people laughing a lot during the lunch. After his
daughter was born two years ago, several times he would post tons of images of his daughter and
wife to his lunch group friends. Frankly speaking, at that time I was thinking: hey, why would
you send so many photos to so many people? But I have to admit that: he must love his family so
dearly, and must be so proud of them!

In the fall of 2007, our group had a high-profile project called debarment (involving DOJ), and a
developer position was needed at that time. After passing interview, Wei got that job. It must be
a career move-up for him, and he was eager to learn more hard-core programming skill. During
the initial system design stage, Wei was doing quite OK. In the later code implementation phase,
it's clear that he was overwhelmed by the assignment. He would send a dozen of "help seeking"
emails to me in one day. We knew he worked extremely hard, and actually had a help plan to
finish the project if he really couldn't. However, disaster happened without notice. In November
2007, FCC security officer informed us that Wei had violated FCC security rule by installing
software to access his work station from home without permission. The conclusion was clear that
Wei didn't have malign intention, what he wanted was to finish the project on time by using his
own time.

But it was all but too late. I still remember that sad day: it was Friday, which is also the
Thanksgiving Party Day for several groups in FCC. It was sad day not only for Wei, but also a
sad day for me, and for all the people getting involved. In that day, most people have no idea
what was going on. Wei was sitting there lonely in his cubicle. I greeted him, and looked at his
eye, I wanted to say something, but couldn't. You could felt the pain in that miserable man's eye;
he was hurt and helpless. I knew what may happen to him, and what would that mean to his
family and his fragile American Dream.

Wei was let go that Friday afternoon. I couldn't sleep well for the whole weekend, since I felt
strongly the sense of shared responsibility to the failure of Wei's job, and more possibly to the
failure of his future life!

That feeling came back to haunt me when I am writing this letter right now. I am thinking: what
if he came forward to let us know that he needed help on the project? What if we gave him a

second chance to let him stay with the job? He is a failure product for this society, and this society hasn't given this man much break in his life.

Wei's bonehead act is despicable, but his behavior has not caused real harm to the society so far. If that is the first time he violates the law, could your honor (representing the society) please considering give him another chance to get his life back to the right track with mercy? I am making this pledge to you not only for Wei, but also mainly for his heart-broken family.


Regards,

Sincerely yours,

Hua Lu (PH. D)
6817 Calverton Dr.
Hyattsville, MD 20782
301-864-6402 (home)
SirHuaLu@yahoo.com

May 27, 2008

The Honorable Henry Kennedy
United States District Court Judge

To Whom It May Concern:

I am writing this letter on behalf of Wei Chin. I am currently a Vice President at NCB Capital Impact, a nonprofit financial institution located in Arlington, VA. I first got to know Wei in Beijing in 1991 when he was a student at Renmin University, one of China's premier educational institutions. I was teaching in the university as part of the Princeton-in-Asia program. Wei was an English major, and for two years I taught him and his classmates a variety of courses including American literature, composition, and oral English. At the time I knew him as a bright, good-natured student who had both discipline and motivation.

After I returned from China in 1993, I did not have any contact with Wei for a number of years. However, in 2007, I reconnected with Wei and his wife Fang—also one of my former students—after a chance encounter. Our families shared several meals together. It was my impression that he was a good father to his young daughter. I also noted that Wei had remained close to his parents as they accompanied him on a visit to my house.

It is my understanding that Wei has recently pled guilty to a serious charge and will soon face a sentencing hearing. I would like to urge that his sentence be reduced by the greatest amount possible in light of his prior clean record and his responsibilities as the father of a two-year old girl. I know Wei's actions have caused his family great pain, and I believe he sincerely regrets his behavior. I believe he is the type of person who, if given the chance, can make a fresh start and begin the process of leading a productive life.

If you have any questions, please do not hesitate to contact me at (240) 205-9208.

Sincerely,

Andrew Weaver



May 26, 2008

Case: Wei Chin

The Honorable Henry Kennedy
United States District Court

I am writing in reference to Wei Chin who became our employee in late 2004. Wei was hired as a programmer to help with several projects we had, coding web sites and helping to troubleshoot web site problems.

During the course of his employment with us, he was diligent in his work and was eager to learn new skills. He had a pleasant character and everyone in the office was happy to work with him. I found him an honest person listening to direction and trying very hard to execute on the directives that were given to him.

At no time did I see any illegal activities such as wasting time on improper web sites, chatting with other individuals other than on business matters or using company resources for his own benefit. He did go out of his way to accommodate us on weekends and beyond working hours and to get tasks done.

I was quite shocked when I heard what had happened to him and did not expect this sort of behavior from Wei. I can only think that he must have been under so much pressure to become successful that under desperation he undertook improper actions that lead to his current situation. There is no doubt that this sort of behavior requires some sort of punishment, but having said that I can pretty much  say that this has been the act of a first time offender and there should be some consideration as to his situation, his family and legal status in the U.S.

As an immigrant Wei and his wife have struggled to establish themselves in the U.S. but have not been as fortunate as many other immigrants have, yours truly included. This is quite unfortunate, but everyone deserves a second chance and I hope Your Honor can see the way to have some leniency on Wei for the sake of his wife and his very young daughter.

I wish Wei and his family the best through this hard time and know that Wei is remorseful and has learned his lesson and is ready for a new beginning. I would be willing to give further favorable character references on Wei should the court ask for it.
Sincerely,

Said Khosrowshahi
President

4701 Sangamore Road  Suite 220N ● Bethesda, Maryland 20816 ● Tel 301-320-6080 ● Fax: 301-320-6670

Date:    May 26, 2008

From:    Mark Lloyd
         35 Shattuck Rd.
         Hadley, MA 01035
         413-461-1055 (h)

To:      The Honorable Henry Kennedy
         United States District Court Judge

Re:      Reference Letter for Wei Chin

Dear Judge Kennedy,

I attended the University of Massachusetts at Amherst from 1994 to 1998. While studying there to earn an undergraduate degree in business I met Wei Chin.

As I remember it, we met in one of the lounges in a graduate dorm called Crampton in the Southwest residential area. We ended up eating lunch together with a mutual friend.

I immediately liked Wei. He was engaging and loved to laugh. I was impressed with his intelligence and skill-level in English. As we ate I found it easy to talk with him because he was very open and willing to share with me what he was thinking. I found him to be very genuine, honest and real.

I invited him over to my home and I remember having dinner with him and some more friends. I enjoyed having him over and we all had a great meal together. Throughout our time in school we maintained our friendship.

Since graduation we have also kept in touch. I am very glad that we've been able to maintain a connection even while living in different areas.

I also look forward to continuing our friendship long into the future.


Regards,

Mark Lloyd

22 Jewett Street
Northampton, MA 01060
June 5, 2008

The Honorable Henry Kennedy
United States District Court Judge

Your Honor,

I am writing to offer a character reference on behalf of Wei Chin. I have known Wei Chin for eight years, since 2000. I met him through his lovely wife Fang Wu, who attended the graduate school of business at the University of Massachusetts with me. He attended my wedding, and has stayed at my house numerous times while visiting the area. We spent a great deal of time together when he was living in the area, and kept in frequent contact when he moved to the D.C. area. I am currently a 6th grade special education teacher and high school soccer coach. I am married and have a three-year-old daughter.

Wei Chin has always proven to be a good friend and honest person. He generously spent many hours of his time assembling a computer for my elderly mother, refusing any payment. He once drove up to Massachusetts on Memorial Day weekend and spent the entire weekend building me a computer. He would not accept compensation and told me he was happy to do it for a friend. He is a kind person, who never has a negative comment to make about anyone. Whenever any of my family or friends needed help in any way, Wei Chin graciously offered any assistance that he was able to render, no matter how busy he was.

Wei Chin was extremely excited and proud to become a father within the past couple of years. He and Fang doted on their beautiful little girl, Claire. I also know that Wei Chin was a hard worker, and was always very concerned about providing for his family.

While I do not know all of the specifics of this case, any transgression would have been completely out of character for the Wei Chin that I know. I have spoken with Fang a number of times since Wei Chin's arrest, and from her accounts, he is absolutely devastated for the pain his actions have caused his family, and remorseful for what he has done. He made a terrible mistake and he knows it. I am particularly concerned with the hardship that Wei Chin's continued incarceration places on Fang and Claire, who are both completely innocent of any wrongdoing in this matter. Every time we have spoken Fang has broken down into tears. She has to bear the sole burden of providing financially and emotionally for her daughter. She is a sweet, kind and wonderful person, who does not deserve any of this.

I respectfully thank you for your consideration of this letter.

Sincerely,

Edwin J. Scagel

Paul Harvey
9062 Clendenin Way
Frederick, MD 21704
06/10/2008

The Honorable  Henry Kennedy
United States District Court Judge

I was deeply shocked to hear of the arrest of my friend and former co-worker, Wei Chin, and I wanted to write a short summary of my impression of Wei - hoping that it may be helpful, in some way, in achieving for him a reasonable level of leniency.

I first met Wei when he interviewed for a web developer position at the Federal Communications Commission in 2005. We offered him a position and he joined us in July 2005. I am the technical lead of the web development team for the Wireless Bureau, and Wei worked with me and under my direction when working on web development projects (he worked on some other project also)..

Wei was always an extremely pleasant, courteous and helpful team member. He would frequently volunteer for tasks, and work hard on those assigned to him. I also found him responsive to my direction and input. I recall Wei volunteering for tasks few others were happy to do, such as keeping the minutes of our team meetings, and cleaning out the office kitchen. On one occasion, I had suggestions as to how Wei might improve his code on a particular project. He took no offense at my suggestions, but went away and made substantial changes based on my input, thanking me afterwards.

On a more personal note, it was delightful to see Wei's devotion to his daughter, Claire. He would frequently share photos of her with me, and would love to talk about her and her development.

However, as I have gained an understanding into the circumstances and personal issues which lead to Wei's current predicament, it meshes with some other observations I have of Wei's time with us. It became clear fairly early on that Wei struggled with programming -- it did not seem to me to be a natural fit for him. I often felt that he needed a lot of supervision to see more complicated tasks through. At one point I recall suggesting to him, that in looking to his future he might consider other career paths within the IT world that might be a better fit (for example on a help desk, where Wei's generally strong technical aptitude, friendly demeanor and lovely way of dealing with people would shine.)

On a couple of occasions I talked with my supervisor regarding my concerns over Wei. This eventually led to her placing Wei under some level of probation. I am not aware of the details of this, but I was aware that Wei was applying himself to his work with immense diligence. At the same time though, I began to notice an intensity about him that I had not noticed before. He did not smile or chat as much, but seemed to withdraw from the team. Tension also arose between Wei and another team member – something I'd never observed before.

Wei's final task which with us, not assigned by me, was probably above his head. It

involved a programming language and framework he'd not worked with before, and had a tight deadline. I confess to worrying about how he'd handle it. Looking back now, I can see that the increased intensity I saw in him, was arising from the immense pressure he was feeling.

It was a great shock to me when my company had to let go of Wei. He had evidently attempted to access the FCC network from off-site - a practice forbidden by the FCC without prior approval – and when this was detected and he was asked about it, he must have panicked and not been forthcoming about it. However, Wei had attempted this out of the pressure to finish the task before the deadline. Wei certainly acted naively in this scenario, but with a sincere desire to deliver his code on time. I am not sure, but Wei's future employment with us may have been contingent on his success on this task.

Had Wei been "himself" and thinking clearly, it would have been obvious to him that the FCC would inevitably discover his off-site access attempts (they constantly monitor such things). In addition, when questioned by the FCC, it would have been obvious that denying it couldn't possibly be beneficial, since he'd been caught red-handed. But as I now understand, Wei was not "himself", but acting out of the desperation he was feeling at losing another job.

It seems that the stress of Wei's repeated job losses, and poor judgment have landed Wei in trouble again – of a far more serious nature. I sincerely hope that he will be given the opportunity to learn from his mistake and put this behind him. I hope too that, given the background to Wei's crime, he will be shown some leniency. My take is that he's a good guy who got desperate, and in his desperation made a serious mistake, one he would never, under normal circumstances, have mades.

Sincerely,
Paul Harvey
Lead Web Developer
Wireless Bureau - Federal Communications Commission

From: Teresa Wojayles
895 Front St.
Chicopee, MA 01020

To: Fang Wu
1385 Jay Road
Eldersburg MD 21874

To whom it may concern,

Opinion about Wei Chin: I met Wei Chin in the year 2000/2001. The meeting took place at the office building he worked at and I was cleaning in the evening. I know Wei as a very friendly and family oriented person. He was very helpful and initiated help whenever I needed any. Wei never asked for anything in return. The help ranged from kind gestures such as throwing away his own trash so that I didn't have to do it in his office block to help with my daughter's personal computer. He always offered to be a help if a problem was to arise in the future. Right from the beginning I know Wei as a family person. He always talked about his wife and when his daughter was to be born, he was very excited about her development and her birth. Right after she was born I saw pictures of the baby and Wei's wife as well as him with his daughter. For Christmas I received a card from Wei and his wife with their baby on it. I know that Wei love's his family very much. He is humane and I always enjoyed his company as he talked about his family and their future together.

Teresa Wojayles

Monday, May 26, 2008

Dear Honorable Judge Kennedy,

I'm writing to express my hope and support for Wei Chin and for any mercy you see fit to consider granting him.

I was shocked and saddened to learn of the circumstances that bring him to this point. His choices and judgement have disturbed me deeply but I am strongly convinced that Wei is capable of redeeming himself and that his crime and punishment,

2

thus far, already represent great suffering. The hardship that lies ahead for his young family is significant.

I have known Wei for 3 years now, having met him through our mutual work for the Cardiovascular Research Foundation. in 2005. We spent many hours together and had lengthy conversations about work and family. I found in him a sincere, thoughtful and kind person. Professionally, he was contientious and thorough. I have had Wei, his wife Fang, daughter Claire and mother-in-law

3

to my home and we have gone out socially. I was so hopeful that they had a promising future here because they had both worked very hard for their dream. Wei is a good father to Claire. He spoke to me often of his new baby and the importance of providing for her the best he could. I am saddened now by the implications that his actions now point to and, therefore, ask you to show mercy on him and, in doing so, on his family. Sincerely,

Charlotte Lebahon